oral argument and I expect we'll probably take a break after the, probably after the third case, a short break. We begin with United States v. Williams. Mr. Wisely. May it please the court. I'm Vincent Wisely and I'm here on behalf of the appellant, Howard Williams. The government distinguishes this case on one fundamental basis. That is, they distinguish this case from other cases that apply the rigors of Federal Rule of Evidence 702 to cell phone data extraction technology or testimony that involves that type of technology, particularly Cellbrite technology. And that fundamental basis is that it requires no specialized knowledge or a technical understanding of the internal mechanics of the extraction process on the part of the witness. And therefore, no sponsoring expert is required. What have the other circuits done on this, Mr. Wisely? I'm sorry, I didn't. What have the other circuits done, the other Federal circuits, what have they done? Yes, Your Honor. I do recognize that the appellant does not have many cases to draw upon where the facts were the same or the conclusions drawn by the court were to apply Rule 702. However, there is one common denominator across all of those, many of those cases, if not all of them, and that is that the subject matter that is being testified to should come from the officer's personal knowledge and observations. And that if the wealth of that information is not being used to support the facts, it should not be used to support the   And you say it's context specific? There's no bright-line rule? Yes, Your Honor. And you filed the motion in limine? Yes, Your Honor. And was that carried with the case? Yes, it was carried with the case. So, your objection is to the trial court's ruling, when I take it you object to off Detective Rush? Yes, Your Honor. But you were given an opportunity to voir dire Rush? I did. I was given that opportunity. Okay. So what then would you quote once he takes the stand? What answer of his would you quote to say most displays that this was specialized knowledge, as opposed to first-hand lay opinion? Well, specifically from his testimony on page 597, lines 3 through 5, he does not only say that he gathers information from this type, or that he gathers this type of forensic evidence. He says explicitly that he investigates it. So, as a self-right operator, he has training, and he has certifications. So, he enhanced his credential. Yes. He just said, the background is I investigate. Is that the strongest example of something? No. So, what's the strongest testimonial example of improper expert opinion evidence, or lay evidence coming in, I guess, that you'd say, and yet the answer actually rests on specialized knowledge? I believe that it rests upon the fact that this particular witness, as many witnesses in these types of cases, have this training and certification. If it was as simple as turning on and off a machine, connecting that machine to a device, and pushing a button and waiting, no technical certifications or training would be required of officers whose function it is to gather and investigate this type of evidence. So, when the government touts the training and experience, the certifications, of the particular witness in front of the jury, creates a circumstance whereby the witness, although not being qualified as an expert, enjoys the perception by the jury of being an expert. It then blurs the line between lay testimony and expert testimony. It is essentially expert testimony in lay witness clothing. So, I believe that's the strongest distinction. Let me make sure I understand how this was presented to the jury. So, all this information is taken off the phones, and this particular witness had looked at it. Was any of this displayed to the jury? Was there a big monitor in the courtroom that displayed what pages looked like, or anything like that? Yes, Your Honor. So, it seems to me, on the expertise angle, are you arguing that expertise was needed to explain that what was there was actually what had been on the phone, and wasn't distorted in the removal process? There were some pictures involved, that that was the actual picture? Where is the need to link the process to the, it seems to me, and correct me if you think otherwise, to the reliability of what the jury was being told and shown? Dates and times were very crucial in this case, as they are in all cases, and it's dates and times that are specifically and often corrupted by malware security vulnerabilities, data integrity issues. And in this particular case, the claim related to dates and times that could have been corrupted. Well, you did raise, were you trial counsel? I'm sorry? Were you trial counsel? Yes, Your Honor. So, you did raise at trial, as part of your objection, this malware possibility. The government argues, at least a concern I would have, is that you didn't have much to go on, other than you had some report that malware could affect this. Is that a fair characterization? It is a fair characterization, Your Honor, because this was only a recent claim. So, it seems to me, without more, there's not much the judge had to rely on that how malware could have affected what otherwise, I imagine, looked like accurate sort of information, showing dates and transmissions and whatever. When I reasserted the objection during trial, Your Honor, it was after it was established by the witness, Officer Rush himself, that he stipulated to these issues, this claim, this malware security vulnerability claim. He stipulated to that in the presence of the jury, but then he quickly qualified that it was only applicable to iPhones. And I believe that's where the circumstance was created, whereby the jury perceived his testimony as expert testimony, and then dismissed all possibility that this corruption, that this claim of malware security vulnerability was even applicable to this case. I mean, I think it's a little, same line of questioning. Are you saying that the abuse of discretion here was that the jury heard what, in fact, was specialized knowledge? Or are you saying that the impropriety here is that the government proffered Rush as an expert without qualifying him? In other words, is there expert opinion that came in improperly, or is it that the government bolstered a lay witness to be an expert? Both, Your Honor. I believe that the government bolstered the lay witness without really the anticipation that the lay witness would answer the way he did to my questions regarding the malware security vulnerabilities. And when he did... When you crossed, you didn't ask any questions about reliability, did you? Or can you point to one? I... In other words, you had full opportunity in voir dire, but then, as I remember, you get up to cross-examine him, and I didn't see much going into specialized knowledge. I did not have many questions for him with regard to the specifics on this particular claim, because, again, as I said, these were recent claims. I was hoping that the witness would have more information and more dialogue concerning the subject matter. But I believe that once the witness recognized that he was crossing the line, then I believe that's where he backed off and he started to claim that it was only his function to gather the evidence not to interpret it. But typically in these cases, Your Honor, what happens is what the government does is that the government will introduce this evidence in total as a complete report through one witness, who is typically a member of the same investigating team, but then they will interpret that particular evidence through another witness. And so, therefore, they, I guess, avoid the possibility... But that's what I'm asking you. Can you quote from me any government witness who interpreted evidence that a lay juror wouldn't normally comprehend? That's why we require 702 for fingerprint evidence, for example. Is there a sentence from any witness that was interpretive beyond the knowledge of a juror? Other than, Your Honor, the fundamental aspects of those particular text messages, the dates and the times, of course, the phone numbers and the data of that nature. But there is nothing that I can draw upon at this moment where a witness, or where there was a dialogue as to the reliability of the evidence that the witness was interpreting. You didn't file a reply brief. That's your prerogative. But that means the answers the government has given, we don't yet know your response. So, of course, one answer they've given is, all of this is irrelevant because the victim testified herself and there were other text messages implicating her client. Do you want to now respond to sort of the harmlessness argument? Your Honor, I do recognize there were other pieces of evidence in this case that were significant, but I believe that with respect to this evidence, this was the majority of the evidence. This was what most of the trial concerned and most of the evidence was related to, or testimony was related to. And so I believe that it's important that this issue be settled because, again, because I believe that, as I know that the government dismisses the Worley opinion out of the Seventh Circuit, but I think it stands for the proposition, I think the proposition is what we draw upon, and that is that the witness needs to have more than just an understanding of one or two isolated concepts. They have to know how technology works with other technology to preserve information, to maintain its integrity, this type of thing. And I think that it's important that this issue be settled because, again, we stand the chance of blurring the line between lay testimony and expert testimony when it's not that onus of a burden to qualify a witness as an expert. He had the credentials. There was only one more step that would have been necessary, and that was to have asked the judge to qualify him and to enter a finding. But they didn't do that. I don't know why they didn't do that, but they didn't. I don't believe that the witness or that the judge would have denied the witness the status of an expert, as has happened in other cases, but they chose not to, and I believe that's the most problematic part of this case. The whole extraction was given to you as discovery, so it's not like that Sixth Circuit Grineer case, correct? It's not that something was withheld and then the government said, oh, we didn't give it to you because this isn't an expert. Here, you had it all, discovery-wise. I did, Your Honor. I had it all. Thank you. So the government relies heavily also upon the case of United States v. Chavez-Lopez. I think that was probably the case that was most talked about in the briefing, and that's out of the Fourth Circuit, and they used this to support the fact that Cellebrite technology specifically does not require specialized knowledge. But in the government's brief itself, it recognized three distinguishing features of that case that not only distinguishes it from other cases that are seemingly favorable to the appellant, but from this case, and that is, one, again, a common denominator across all of these cases is that this information that the witness is testifying about should come from personal knowledge, personal observation. And in this case, it came from training and experience. There's no denying the fact that that wealth of experience bore upon his observations. Second, that, and I guess, based on that, the officer's testimony was not, as this Court has previously stated, a product of reasoning that is familiar to the average person in everyday life. I believe that's the way that it was stated or that's the way the standard has been articulated. So because of this training and experience, it was not information or it was not the product of reasoning in everyday life. I mean, I wouldn't know that this particular cell phone needed to have two extractions run. In this case, the defendant's phone was a phone that the officer stated was manufactured in a manner that would affect the functionality of the cell phone required two. And, of course, nobody in that courtroom, and I don't believe anybody in this courtroom would know why or what one extraction or how one extraction was different from the other. So I believe that it's important. You said there were three, three points of distinction. That's two. Yes, that's two. The third point of distinction is the fact that in the Chavez-Lopez case, the witness in that case didn't make any statement regarding the reliability or effectiveness of the software. And in this case, as I've stated already, the testimony by the witness in front of the jury that this possible reliability issue applied only to iPhones was a clear statement. It was implicit. I would argue it was explicit, but either way, explicit or implicit, it was a validation of the integrity of the data. So I believe that those three distinctions, which were right in, which were in the government's brief, is what distinguishes Chavez-Lopez from this case. And I believe, I think those distinctions are inherent and prevalent in all cases that we look at that the government has cited. And the case, you know, here in the Fifth Circuit, the United States versus Rubio case that the government cited, that was not completely instructive to us. The court reiterated its past treatment of the Cellbrite technology, but that was a confrontation clause issue. And I think the question there was whether or not the statements that were extracted from the defendant's phone that were authored by a co-conspirator were testimonial in nature, and the court ruled that they were not. But that's, but this, I believe, is a matter of first impression, at least with the facts that we have in this case, Your Honor. And so I would ask, Your Honor, that we, that you hold that this, that the Rule 702 does apply in this case and should have applied during trial. Thank you. Thank you, Mr. Wisely. You've saved time for rebuttal. Ms. Pryor? Good morning. May it please the Court. Lindsay Pryor on behalf of the United States. The District Court properly admitted the Cellbrite evidence without qualifying the officer as an expert for three primary reasons. First, every circuit that has addressed this issue has concluded that testimony about a basic Cellbrite extraction does not implicate Rule 702. Second, the officer's testimony in this case squared exactly with the fact testimony in those other cases. He described his personal experience using Cellbrite and the steps he took to extract the data from the two cell phones in this case. And third, there is no reason to distinguish this case based on a purely hypothetical security issue, when there was absolutely no evidence that the extraction was compromised in any way. The government, are you asking, well, I guess first question is how, what's the order that's being appealed from? Is it the original denial of motion in Lemonet or is it the objection to Rush's testimony? I believe that it is both, as the opposing counsel just offered. There was a generalized objection that the evidence should not come in on the basis of 702, but then he's arguing that there was improper expert testimony because the, because Williams, the officer was implicitly vouching for the software. Okay. And, and the government's rule of law, are you saying there's a bright line rule that Cellbrite is just simple enough for lay people or do you agree that, especially because this is a first impression and this, as I understand it, this extraction is happening all over. So, it's federal and state law enforcement. So, the ruling here by us, if it's a published ruling on admissibility of Cellbrite, is very consequential. Is the government pressing a bright line rule never expert evidence needed or is it context specific and here this witness didn't offer any specialized knowledge? We are not pressing a bright line rule that the use of Cellbrite could never implicate 702 or require expert knowledge. But here, as the other cases that have addressed this issue make clear, this was a basic, a basic Cellbrite extraction, which the process of is routine, plug the phone into a Cellbrite device, as the officer explained, the follow a few prompts and the machine extracts the data, and then the software does all the work to convert it into a . . . So, you would accept the Worley Seventh Circuit reasoning if it's more complex, if it's a computer but still Cellbrite, and if the witness happens to stray into anything about, you know, beyond what a juror could understand, then you would need expert testimony. It would still be fact specific. It would depend on the testimony being offered and the allegations in the case. The Worley case is distinguishable for a few reasons. The forensic examination, as the court made clear, was more complicated in that case. It was not a Cellbrite case. It did not involve basic, a basic download of cell phone to a . . . So, the rule is going to become, was this a basic download or not? Is that, am I oversimplifying it? Because if it's not basic, then you need an expert. Was it a basic, was the forensic extraction process basic? Was the testimony needed to describe the process more technical? And then key here is also the fact that there was no interpretation of any forensic data by the officer. So, all he was doing here is testifying to the contents of the text messages that were being, that were extracted and the contents of the images from the extractions. So, there was no interpretation of forensic data, which makes it different than the Gainier case, for example, where expert testimony was required to decipher a hard-to-read symbol. Polygraph, fingerprints, that's the type of thing. Okay? I guess you heard my twin, that this case seems to go two ways, though. I agree, I haven't spotted something that sounds too specialized in interpretation. But isn't it true that this case is unlike all the other circuits, in that the government drew attention to Rush's certifications? Right? In questioning them, the government draws out in front of the jury, this man was certified, right? Let me look and see what he said. He said, I'm a certified Celebrite operator. I'm a certified physical analyzer. That sounds like the government's trying to enhance someone as someone with specialized certifications. Here's the question, is there any other circuit case involving Celebrite where the testimony that's elicited is all about special certifications? Can you think of one? Your Honor, in Marsh, the second circuit case, the officer did testify to his certification or experience using Celebrite as well. I'm not sure you would characterize it as emphasizing specialized knowledge, but I also wouldn't agree that there was unusual or special emphasis placed on his certifications here, because officers testify based on their personal knowledge and experience all the time, and that doesn't make it specialized scientific or technical knowledge under the realm of... He's a detective. He's a detective, right? He's an investigator, yes. He's an investigator with the Irving. So when an investigator gets on and says, I'll tell you about my first-hand lay observations, oh, but by the way, I'm also certified multiple times, that's not beginning to get close to the 702 line? I agree that he... It did bolster his knowledge and the reliability of his testimony with respect to using the Celebrite extraction, but no, I do not believe that it implicated 702. There was a question about what's been appealed, so I'm just looking. The notice of appeal is from the judgment of conviction and sentence, so that would bring up any of the underlying orders, I believe, would it not? That's right, Your Honor. Was the motion in limine died or carried with the case? The district court issued a written ruling on the motion in limine pretrial, denying the objection, and then permitted trial counsel to award it at trial. Yes, Your Honor. So in sum, Officer Rush testified only to facts within his personal knowledge, and he did not require or use specialized or technical knowledge to explain the extraction and authenticate the evidence. Next, Mr. Williams' challenge to the reliability of Celebrite has always been completely hypothetical, and he presented no evidence to the jury on this point. His entire argument in the trial court was based on a blog post making the point that Celebrite had a security vulnerability and that it needed to be more cautious about untrusted data, but there was no evidence that the phones here contained that type of code, that there was any malware or security issue with respect to the extraction. And as you noted earlier, Judge Higginson, if he had the opportunity to cross the officer, and so if he had had any evidence that there was an actual issue with the extraction or a security issue here, he could have presented it. And then finally, Officer Rush was not implicitly vouching for the software because he provided absolutely no assurance about how it would perform. He made clear that he was just an operator operating the machine and he was not privy to the programming. There was no testimony from him that would be perceived as or explicitly was stating that all this is reliable, that this is exactly the way it looked on the phones? With respect to the questions about the security issue, no, he made no statement with regard to the reliability of the phone, he said. And you can look at record 619-21 for reference on what he said on this point. He said, I have not heard of any malware being introduced with Celebrite, that the security issues affected only an iPhone and a certain app, that app is not on the phone, and that as an operator I purely operate the machine. So nowhere in that testimony is he offering any assurance about how well it would perform. You must inform the jurors, don't be worried about the accuracy of this, because this wasn't an iPhone. And it was his specialized knowledge that allowed him to say that. Your Honor, I think the officer was not put on to testify to the reliability of the software, of the reliability of Celebrite. He was purely a fact witness who was put on to testify about the extraction process, and then to testify to the contents of the phone. And there was never any, you know, there was never any issues pointed out with respect to the extraction report itself. So I do not believe that he could have, he didn't get converted into an expert by virtue of being asked questions about the reliability of the, or being asked questions about a potential hypothetical security issue, and just by saying that he hadn't heard of such an issue, that made him an expert. Is your position, is there evidence, or at least is it your argument, that this particular program does nothing more than take the information off of one device and put it in the same form on another device? Or is it converted in some way, either in format, in appearance? So how is this information? He could testify looking at the defendant's or the victim's phone, and saying this is what his phone said. Instead, it gets downloaded onto another device. Are you saying this is nothing more than that, or is it more than that? No, that's exactly, that's exactly what was the case here. So Cellbrite does extract the data, and the software turns it into a readable report by categorizing the information. But that becomes, and what the jury saw, was printed out, essentially, screenshots. The officer could have done essentially the same thing. It would look the same as a screenshot off the phone. That's right, Your Honor. If it's helpful, the extraction report is record page 1003. You can see what the extraction report that the jury saw. Cellbrite captures more information from a phone. It captures metadata and information like that. But what the jury saw, and all that was being testified to, were just contents of the phone. So in this case, it would have been no different than, like you said, him taking screenshots of the phone and reading off of them. Your friend on the other side says that dates are important, dates and times to correlate events with what the victim said, and what the defendant admitted to. And at least to some extent, I took it at least in oral argument, he's relying in part on that possible distortion. Is that accurate? Are dates and times important in this case? What happened, in what order, does that happen? There was no real dispute at trial about the dates and times that the events at issue took place. So a couple responses would be, one, dates and times, the dates and times were corroborated by multiple other pieces of information, including the victim's testimony, testimony by the other officers who did the investigation, the other text messages that were not obtained with Sellbright, so those are record 925, and the dates on those text messages match exactly the text messages that did come from the Sellbright report. So the dates and times were not really disputed by Mr. Williams. In fact, on the harmlessness point, nothing in the contents of the text messages from Sellbright were really in dispute at trial. The crux of his argument at trial was that the defendant needed, that a higher standard of causation was required than what the government was arguing for, that he had to have caused her to engage in sex trafficking more akin to a forced standard. So none of the content of the text messages were really heavily in dispute at trial. So as I noted, any error, even if the court does find that there is error in admitting the Sellbright evidence, the evidence was overwhelming, and it was corroborative of multiple other pieces of evidence that were introduced. That included a videotaped confession by Williams where he admitted to getting the victim a hotel room, having sex with her, lining up men to have sex with her, and making money off of her. The jury saw the victim's incredibly emotional testimony about how the defendant, she had met him online, how he had picked her up from a nearby middle school while she was wearing only her pajamas, and carrying no keys and no ID, and how he took pictures of her, made online sex ads of her, and then coordinated commercial sex transactions for her. The jury saw the hotel receipt for the hotel that Williams rented for the week she was being trafficked, which also again corroborated the dates in the text messages. The jury saw copies of the online advertisements that he created for her. And then, again, it saw dozens of other text messages that were not obtained with Sellbright that came from a subpoena to the messaging app that Williams was using to communicate with potential sex customers. So, in conclusion, even without the Sellbright evidence, there was more than enough evidence to convict Mr. Williams of sex trafficking. And if the court has no further questions, I will cede the remainder of my time. Thank you, Ms. Pryor. Mr. Wisely for rebuttal. Thank you, Your Honor. The government states that this was a basic cell phone extraction, and of course the appellant would disagree, primarily because of the fact that we have the training and experience element in this case, and we have the statement by the officer, who I believe enjoyed the perception as an expert by the jury, of the reliability of the extracted data. The Gainier case, as the government mentioned and distinguished, I believe is important because it states, as a proposition, that when construing this rule, if the officer's testimony in any way draws from scientific, technical, or special knowledge, it is covered and it should come under Rule 702. She also mentioned the Worley case, and has distinguished that here in court as well as in her brief. But again, the Worley case stands for the proposition that if the officer's wealth of experience, or if his training and education bears upon his personal knowledge or observations, that that is expert testimony. I believe that is, or should be, the bright line rule. It will avoid us in court from blurring the distinction between lay testimony and expert testimony. We would be creating a circuit split, is that right? Would we be creating a circuit split? Yes, Your Honor, we would be. As the court faced in the Julius case, which was after in which the Seventh Circuit reconsidered its treatment of this issue in the Worley case. In the Julius case, that case was a basic extraction. That was a basic extraction of a cell phone. Of course, that case went up to the circuit court on plain error review. And so the circuit court, although they asked plenty of questions during oral argument concerning the issue, and they did fear that this would create a circuit split by their decision, they avoided the question, or they did not have to reach the question, I should say. And they stated specifically that they would leave the broader implications of Worley for another day. Well, the broader implications of Worley is whether or not 702 should apply across all devices, not just a hard drive, but also a cell phone. Because in the Worley case, there was a footnote that said that cell phones were not included in their analysis. But all devices, I mean, isn't cell bite evidence closer to a copying machine, right? It's just printing out what's already there. It's not interpreting, say, fingerprint evidence. Do you disagree? No, Your Honor, that's correct. It's not interpreting fingerprint evidence. That certainly would require... Or polygraph or medical tests. So you wouldn't say a device that's a photocopier, if the agent is just going to say, well, I photocopied this. No, and I also would not say that it's a photocopier, a mirror image of the cell phone. I would not say that either. I believe that if that was the case, then Cellbrite wouldn't have to use a complicated software to read the information and to interpret it. So the software is interpreting a lot of this information and putting it out in readable form. I thought Rush testified, and after I ran the extraction, I confirmed that each image was an image that I can presently see on the phone. It's an identical mirror. He didn't say that? He did, but he was only talking about some of the images related to some of the advertisements. He wasn't talking about the entire extraction report, that the extraction report, every page of it, the thousands of pages that were produced were an exact mirror image of the phone. That's not what he was saying. He was saying that the photos that he, that the software spit out, that those photos were the same as the photos that were contained in the defendant's phone. But when we go so far as to say that this is a mirror image... Those photos, just to test you a little, those are the photos that incriminated your client. In other words, it's not a plain view type case where the government found something else that's complex or distorted. It is the mirror image photos that they used to incriminate. Those photos were photos that were contained on the defendant's phone. However, the issue with those photos, it was not clear-cut. I mean, the dates and times were crucial on those photos because there were photos taken by the victim even before she met my client. Yeah, so there, again, the corruption and the malware vulnerabilities could have affected the dates and times on those photos. And again, the government says that... Oh, I'm sorry. Thank you. All right, thank you, Mr. Wisely. And we notice that you're court-appointed. We wish to thank you for your willingness to take the appointment and for your good work on behalf of your client. Thank you, Your Honor. It was my pleasure. All right, United States v. Chasteen.